UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
NATIONAL COUNCIL OF ARAB                :
AMERICANS and ACT NOW TO STOP
WAR & END RACISM COALITION,             :        04 Civ. 6602 (WHP)

                Plaintiffs,             :        MEMORANDUM AND ORDER

            -against-                       :

THE CITY OF NEW YORK et al.             :

              Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        Plaintiffs National Council of Arab Americans (the "Council") and Act Now to Stop War & End Racism ("ANSWER") Coalition bring this federal civil rights action for violations of the First and Fourteenth Amendments against Defendants the City of New York (the "City"), the City of New York Department of Parks and Recreation (the "Parks Department"), the New York City Police Department, the Central Park Conservancy (the "Conservancy") and Michael Bloomberg, Mayor of the City of New York.  Plaintiffs allege that the regulations governing the issuance of permits for events in the City's parks are unconstitutional both on their face and as applied to Plaintiffs.  Defendants move for summary judgment on all claims, and Plaintiffs move for summary judgment on their as applied challenge and certain portions of their facial challenge.  For the reasons set forth below, Defendants' motion is granted in part and denied in part, and Plaintiffs' motion is denied in its entirety.

BACKGROUND

The Great Lawn is a 13-acre section of Central Park consisting of eight softball fields and a surrounding landscaped area. (Joint Statement of Undisputed Facts, dated Mar. 7, 2006 ("Joint Stmt.") ¶ 4.) Between 1995 and 1997, the Great Lawn underwent an extensive restoration that involved the placement of new soil and sod and the installation of new drainage and irrigation systems. (Joint Stmt. ¶ 5.) The restored Great Lawn has been the site of up to two free performances by the Metropolitan Opera (the "Opera") each June, and up to two free concerts by the New York Philharmonic (the "Philharmonic") each July. (Defendants' Statement Pursuant to Local Rule 56.1, dated Mar. 7, 2006 ("Def. 56.1 Stmt.") ¶ 7.) It was also the site of a September 11 memorial concert in September 2002, a concert by the Two Tenors in July 2003, and a concert by the Dave Matthews Band in September 2003. (Def. 56.1 Stmt. ¶ 7.)

The regulations governing the use of the City's public parks (the "Parks Department Regulations") provide that "[n]o person shall hold or sponsor any special event or demonstration without a permit." 56 R.C.N.Y. § 1-05(a). A "special event" is defined by the Parks Department Regulations as "a group activity including, but not limited to, a performance, meeting, assembly, contest, exhibit, ceremony, parade, athletic competition, reading, or picnic involving more than 20 people . . ." 56 R.C.N.Y. § 1-02. A "demonstration" is defined as "a group activity including but not limited to, a meeting, assembly, protest, rally, march or vigil which involves the expression of views or grievances, involving more than 20 people . . ." 56 R.C.N.Y. § 1-02. The term "special events permit" is used by the Parks Department to refer to permits for both special events and demonstrations. (Declaration of Elizabeth W. Smith, dated Mar. 2, 2006 ("Smith Decl.") ¶ 4.) "[C]asual park use by visitors or tourists" is exempted from the regulations' permitting requirement. 56 R.C.N.Y. § 1-02.

Section 2-08(c) of the Parks Department Regulations allows the Parks Department

2

to deny a special events permit for one or more of the following reasons:

> (1) the location sought is not suitable because of landscaping, planting, or other environmental conditions reasonably likely to be harmed by the proposed event;
>
> (2) the location sought is not suitable because it is a specialized area including, but not limited to, a zoo, swimming pool, or skating rink, or because the proposed event is of such nature or duration that it cannot reasonably be accommodated in that location;
>
> (3) the date and time requested have previously been allotted by permit;
>
> (4) within the preceding two years, the applicant has been granted a permit and did, on that prior occasion, knowingly violate a material term or condition of the permit, or any law, ordinance, statute or regulation relating to use of the parks;
>
> (5) the event would interfere unreasonably with the enjoyment of the park by other users; or
>
> (6) with respect to events on the Great Lawn, the conditions for events contained in subdivision (t) of this section are not complied with.

56 R.C.N.Y. § 2-08(c). Subdivision (6) was added to § 2-08(c) by amendment dated December 30, 2005 and became effective on January 29, 2006. Prior to that date, the grant of special events permits for the Great Lawn was governed by the general provisions set forth in § 2-08(c)(1)-(5). (Joint Stmt. ¶ 8.) The amendment added the following conditions for obtaining a permit on the Great Lawn, as set forth in § 2-08(t):

> (1) In any calendar year there will be a maximum of six permits granted for large events on the Great Lawn. For purposes of this subdivision, a large event is a special event or demonstration with anticipated attendance between 5,000 and 50,000 participants, which requires the use of the ballfields on the Great Lawn.
>
> (2) Small events on the Great Lawn are not subject to the limitation contained in paragraph (1) of this subsection. For purposes of this subdivision, a small event is a special event or demonstration with anticipated attendance of less than 5,000 participants, which does not require the use of any of the Great

3

Lawn ballfields during the hours that the Department permits the ballfields for athletic uses, and does not displace any athletic use on the Great Lawn . . .

(3) Attendance at large events may not exceed 50,000 persons.

(4) Large events may take place only during the months of June and July and during the period from the third week of August through the second week of September. . .

(5) Large and small events are subject to cancellation by the Commissioner at any time in the event wet conditions exist that will increase the likelihood of damage to the park landscape.

(6) The load-in plan for all events must be approved by the Commissioner in order to assure that (A) the flow of persons through park landscapes on appropriately designated paths for that purpose shall be orderly; and (B) the attendees will not damage adjacent landscapes. In addition, in the case of larger events, the load-in plan must be approved by the Commissioner to assure that maximum number of persons attending does not exceed 50,000. In approving an applicant's load-in plan, the Commissioner shall take into consideration any evidence that the applicant has a proven track record of successfully executing event productions and audience management . . .

56 R.C.N.Y. § 2-08(t).

Section 2-08(b)(4) of the Parks Department Regulations provides that when "two or more permit applicants request the same date and the same location, the application from the applicant who held a permit for such date and such location in the calendar year immediately preceding the calendar year for which such permit is now sought, shall be eligible for approval." 56 R.C.N.Y. § 2-08(b)(4). If a special events permit request is denied, § 2-08(d) requires the Parks Department to "employ reasonable efforts to offer the applicant suitable alternative locations and/or times and/or dates for the proposed event." 56 R.C.N.Y. § 2-08(d). The Parks Department Regulations also provide that the "East Meadow in Central Park and the paved areas south of the Bethesda Terrace, including the Literary Walk and the Bandshell areas, are available for large special events or demonstrations." 56 R.C.N.Y. § 2-08(u). Once a permit application is

4

rejected, "the applicant may appeal the determination by written request filed with the designated appeals officer who may reverse, affirm or modify the original determination and provide a written explanation of his or her finding." 56 R.C.N.Y. § 2-08(e).

The Council is a national organization that serves the Arab American community through various forms of activism, including legal defense, education programs and "grass roots empowerment." (Joint Stmt. ¶ 11.) ANSWER Coalition is "a grassroots organization that engages in community and national political organizing and activism including carrying out meetings, protests, mass demonstrations, and other educational activities in opposition to war and racism." (Joint Stmt. ¶ 12.) On January 7, 2004, the Council applied to the Parks Department for a permit to hold a 75,000-person rally on August 28, 2004 on the Great Lawn or Sheep Meadow in Central Park. (Joint Stmt. ¶ 13.) Plaintiffs contend that the proposed rally was organized and sponsored jointly by the Council and the ANSWER Coalition. (Plaintiffs' Statement Pursuant to Rule 56.1, dated Apr. 24, 2006 ("Pl. 56.1 Stmt.") ¶ 1.) The rally was scheduled for August 28, 2004 to protest the 2004 Republican National Convention ("RNC") and to commemorate the 41st anniversary of the 1963 civil rights march on Washington, D.C. (Def. 56.1 Stmt. ¶ 17.)

On March 13, 2004, the Parks Department informed the Council that a decision regarding the permit application was "being reserved until a date closer to the [RNC] so that realistic decisions [could] be made concerning the number and nature of competing events" occurring during the convention. (Declaration of Robin Binder, dated Mar. 7, 2006 ("Binder Decl.") Ex. I.) The Parks Department also advised the Council that its permit request "raises a number of issues which will have to be addressed including the capacity of the Great Lawn, the high risk of damage to the lawn and the displacement of pre-existing uses." (Binder Decl. Ex. I.)

On June 15, 2004, the Parks Department denied the Council's permit request.

(Joint Stmt. ¶ 14.) The Parks Department asserted that the Sheep Meadow was not available for any special events and that, pursuant to § 2-08(c)(1)-(2) and (5), the Great Lawn could not "accommodate an event of the nature [Plaintiffs were] planning." (Def. 56.1 Stmt. ¶ 20; Pl. 56.1 Stmt. Resp. ¶ 20.)

On June 25, 2004, the Council appealed the Parks Department's decision to deny the permit pursuant to § 2-08(e). (Binder Decl. Ex. K.) The decision to deny the Council's permit request was upheld on appeal by letter dated June 30, 2004 from the Parks Department to the Council. (Joint Stmt. ¶ 15.) The letter states that the proposed event "would cause significant damage to the park with the potential to completely destroy the Great Lawn or Sheep Meadow if wet conditions exist." (Binder Decl. Ex. L.) On August 6, 2004, the Parks Department sent another letter to the Council, stating:

> Events held on the Great Lawn are subject to cancellation when wet conditions exist, and are subject to bond and security requirements . . . The size of your client's proposed event would likely cause significant damage to the Great Lawn and the surrounding landscapes. Such damage would probably require closure of the entire lawn for a significant period of time . . . In addition, our management criteria for the Great Lawn are not compatible with events that cannot be cancelled because of rain and cannot otherwise comply with our crowd control and security requirements even under optimum conditions.

(Binder Decl. Ex. O.)

Plaintiffs initiated this lawsuit on August 13, 2004 and moved for a preliminary injunction directing the City to issue Plaintiffs' special events permit and enjoining enforcement of the Parks Department's permit regulatory scheme. On August 23, 2004, this Court denied Plaintiffs' motion. Nat'l Council of Arab Americans v. City of New York, 331 F. Supp. 2d 258 (S.D.N.Y. 2004). Plaintiffs' challenge to the Parks Department Regulations governing the

6

issuance of permits for the City's parks now includes §§ 2-08(c)(6) and (t).[1] Plaintiffs claim that the regulations are unconstitutional both on their face and, where applicable, as applied to Plaintiffs.[2]

## DISCUSSION

Defendants move for summary judgment dismissing the Amended Complaint. Plaintiffs move for summary judgment on the grounds that (1) the permitting system set forth in the Parks Department Rules as of 2004 was unconstitutional; (2) § 2-08(t)(1), (3) of the Parks Department Rules is unconstitutional; and (3) the decision to deny Plaintiffs' permit request was unconstitutional.

## I. Summary Judgment Standard

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The materiality of disputed

---

[1] Defendants suggest that the challenge to the new regulation is limited to §§ 2-08(t)(1) and (3), the subsections mentioned in Plaintiffs' memorandum in support of their motion for partial summary judgment. However, the Amended Complaint is directed to the entire regulation, and it appears that Plaintiffs used their memorandum to identify only those subsections of § 2-08(t) on which they move for summary judgment. Although Plaintiffs should have delineated their claims more clearly, their submissions do not require this Court to limit the claims in the way that Defendants request.

[2] Although Plaintiffs' application for a permit to demonstrate on the Sheep Meadow was denied, the allegations in the Amended Complaint are directed exclusively to Plaintiffs' permit request for the Great Lawn. (Amended Complaint, dated Oct. 18, 2004 ("Compl.") ¶¶ 1, 86-88, 91.)

facts is determined by the governing substantive law. Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988). Material facts are those that "affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Shade v. Hous. Auth. of New Haven, 251 F.3d 307, 314 (2d Cir. 2001). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997). In determining whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255.

If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." Liberty Lobby, 477 U.S. at 248. Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." Liberty Lobby, 477 U.S. at 252. Where it is apparent that no rational finder of fact "could find in favor of the non-moving part[ies] because the evidence to support [their] case is so slight," summary judgment should be granted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

II. First Amendment Claim

    A. Legal Standard

Peaceful protesting is an expressive activity involving speech protected by the First Amendment. United States v. Grace, 461 U.S. 171, 176 (1983). Such expression, when undertaken in a public forum, receives heightened protection.

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public, and time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens.

Hague v. C.I.O., 307 U.S. 496, 516 (1939); see also Burson v. Freeman, 504 U.S. 191, 196-97 (1992); Concerned Jewish Youth v. McGuire, 621 F.2d 471, 473 (2d Cir. 1980); Hous. Works, Inc. v. Safir, No. 98 Civ. 4994 (HB), 1998 WL 823614, at *3 (S.D.N.Y. Nov. 25, 1998). Public parks are "quintessential public forums," Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983); see also Grace, 461 U.S. at 177, in which speech finds its greatest protection, Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006).

"[A] Parks Department permit [requirement] . . . constitute[s] a 'prior restraint' on speech." Beal v. Stern, 184 F.3d 117, 124 (2d Cir. 1999). A prior restraint, i.e., "any regulation that gives public officials the power to deny use of a forum in advance of actual expression . . . is not unconstitutional per se, but it bears a heavy presumption against its constitutional validity." Hobbs v. County of Westchester, 397 F.3d 133, 148 (2d Cir. 2005) (internal citations and quotations omitted); accord Transp. Alternatives, Inc. v. City of New York, 340 F.3d 72, 77 (2d Cir. 2003). Nevertheless, "expressive activity . . ., even in a quintessential public forum, may interfere with other important activities for which the property is used." Freeman, 504 U.S. at 197; Paulsen v. Gotbaum, 982 F.2d 825, 828 (2d Cir. 1992). All speech, including speech in

public forums, may be subject to reasonable time, place and manner restrictions that further a significant government interest. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984); Hous. Works, Inc. v. Kerik, 283 F.3d 471, 478 (2d Cir. 2002). Thus, the "government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold" expressive events, such as a "march, parade, or rally." Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992); Transp. Alternatives, 340 F.3d at 77.

"To withstand constitutional scrutiny, [time, place and manner] restrictions must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression." Deegan, 444 F.3d at 142; Beal, 184 F.3d at 124. Additionally, time, place and manner restrictions of speech in public fora are unconstitutional if they confer overly broad discretion on regulating officials. See Forsyth County, 505 U.S. at 130-31. Thus, when assessing the constitutionality of a content-neutral time, place and manner restriction, the court must determine whether the regulation "contain[s] adequate standards to guide the official's decision and render it subject to effective judicial review." Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002); Hous. Works, Inc., 283 F.3d at 478-79. The government has the burden of establishing that the restriction on speech is a legitimate time, place and manner regulation. See Million Youth March, Inc. v. Safir, 18 F. Supp. 2d 334, 346-47 (S.D.N.Y. 1998).

Content-based regulations are subjected to a strict scrutiny analysis. See Boos v. Barry, 485 U.S. 312, 321 (1988); Perry, 460 U.S. at 45. "Under the strict-scrutiny test, a content-based restriction may be upheld if the restriction serves a compelling governmental interest, is necessary to serve the asserted compelling interest, is precisely tailored to serve that interest, and is the least restrictive means readily available for that purpose." Hobbs, 397 F.3d at 149 (internal

citations and quotations omitted).

    B.  <u>Facial Challenge to § 2-08(c)(1)-(5)</u>

Defendants contend that Plaintiffs' facial challenge to § 2-08(c)(1)-(5), the special events regulation as it existed in 2004, was mooted by the 2005 amendment. However, §§ 2-08(c)(6) and (t) apply only to special events on the Great Lawn, meaning that the pre-amendment version of § 2-08(c) remains applicable to all other special events. "Where a superseding statute leaves objectionable features of the prior law substantially undisturbed, the case is not moot." <u>Naturist Soc'y, Inc. v. Fillyaw</u>, 958 F.2d 1515, 1520 (11th Cir. 1992). The City concedes that Plaintiffs have standing to assert a facial challenge to § 2-08(c) and, therefore, this Court will address the merits of their facial challenge to § 2-08(c)(1)-(5).

For the reasons set forth in this Court's August 23, 2004 Memorandum and Order, § 2-08(c)(1)-(5) is content neutral on its face. <u>See</u> <u>Nat'l Council of Arab Americans</u>, 331 F. Supp. at 267-69. Events involving more than 20 people at the City's parks require a permit, applications for which are reviewed by the Parks Department pursuant to § 2-08. 56 R.C.N.Y. §§ 1-02, 2-08. Nothing in these regulations refers to the views of event organizers or favors one category of speech over another. <u>See</u> <u>Sugarman v. Village of Chester</u>, 192 F. Supp. 2d 282, 293 (S.D.N.Y. 2002) (holding permit regulation to be content neutral where it "reflect[ed] no bias towards a particular . . . content"); <u>Mahoney v. Lewis</u>, No. 00 Civ. 1325 (TFH), 2000 U.S. Dist. LEXIS 10348, at *11-12 (D.D.C. June 23, 2000) ("On its face, [the regulation] is clearly content-neutral; it focuses exclusively on the composition, size, number, and attendance of signs carrying the message and does not purport to distinguish among the messages being portrayed."). The lone exception to the permitting requirement for "casual park use by visitors or tourists" is permissible because it does not discriminate on the basis of message. 56 R.C.N.Y. § 1-02. "[T]he ordinance . . . is not even directed to communicative activity as such, but rather to <u>all</u>

activity conducted in a public park" that involves groups of more than 20 people, and is therefore content neutral. <u>Thomas</u>, 534 U.S. at 322.

The regulations limit the discretion of Parks Department decision-makers by delineating five specific grounds on which a permit may be denied. 56 R.C.N.Y. § 2-08(c)(1)-(5). In this regard, the Supreme Court's decision in <u>Thomas</u> is instructive. <u>Thomas</u> examined a municipal regulation allowing a park administrator to deny a permit for a public assembly larger than 50 people:

> when the application is incomplete or contains a material falsehood or misrepresentation; when the applicant has damaged Park District property on prior occasions and has not paid for the damage; when a permit has been granted to an earlier applicant for the same time and place; when the intended use would present an unreasonable danger to the health or safety of park users or Park District employees; or when the applicant has violated the terms of a prior permit.

<u>Thomas</u>, 534 U.S. at 324. The Supreme Court rejected the petitioner's argument that these regulations grant unduly broad discretion to licensing officials. <u>Thomas</u>, 534 U.S. at 324-25. The criteria set forth in § 2-08(c)(1)-(5) are substantially similar to those at issue in <u>Thomas</u> and, therefore, provide "adequate standards to guide the official's decision." <u>Thomas</u>, 534 U.S. at 323; <u>see also</u> <u>Concerned Jewish Youth</u>, 621 F.2d at 476-77 ("Although the ordinance gives the police a certain amount of latitude in protecting persons, condemned to the use of words, we can never expect mathematical certainty from our language" (internal quotations omitted).).

The permitting scheme is also narrowly tailored. "[T]he requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" and is not "substantially broader than necessary to achieve the government's interest." <u>Ward</u>, 491 U.S. at 798-800 (quoting <u>United States v. Albertini</u>, 472 U.S. 675, 689 (1985)); <u>see also</u> <u>Mastrovincenzo v. City of New</u>

York, 435 F.3d 78, 100 (2d Cir. 2006); Paulsen, 982 F.2d at 829. It is indisputable that "the Parks Department has a great interest in regulating activities within the City's parks" to prevent damage to the parks and to maintain a safe and enjoyable environment for visitors. New Alliance Party v. Dinkins, 743 F. Supp. 1055, 1065 (S.D.N.Y. 1990); see also Clark, 468 U.S. at 296; Paulsen, 982 F.2d at 830. Because of these concerns, "[a] city the size of New York cannot allow rallies or demonstrations to take place in city parks at the whim of promoters." Beal, 184 F.3d at 123. Section 2-08(c)(1)-(5) is tailored to the City's legitimate interests by permitting the Parks Department to prohibit events that (1) might harm the "landscaping, planting, or other environmental conditions"; (2) would be unsuitable for a particular area, such as a zoo or swimming pool; (3) would overlap with previously scheduled events; (4) are proposed by an applicant who has previously violated the law relating to use of the parks; or (5) interfere unreasonably with the enjoyment of the park by other users. The upkeep and security of the parks would be achieved less effectively absent § 2-08(c)(1)-(5). The regulations are appropriately tailored, achieving the City's goals in a "direct and effective way" without overly restricting speech. Ward, 491 U.S. at 800.

The regulations, by their own terms, require the Parks Department to allow for adequate alternative channels of communication. 56 R.C.N.Y. § 2-08(d). Defendants assert, without objection from Plaintiffs, that when a venue sought by an applicant is unsuitable, the Parks Department contacts the applicant to discuss alternative times or sites available. (Smith Decl. ¶ 16.) "The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.'" Mastrovincenzo, 435 F.3d at 101; see also Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 919 (2d Cir. 1990) ("The First Amendment . . . does not

guarantee . . . access to every or even the best channels or locations for . . . expression."). The provision for alternative channels in the Parks Department Rules is sufficient to survive Plaintiffs' facial challenge.

Finally, Plaintiffs assert that § 2-08(b)(4) impermissibly grants preferential treatment to regularly occurring Great Lawn events, namely the Opera and Philharmonic performances. Yet § 2-08(b)(4) is facially content-neutral, and there is no evidence that it was enacted as a pretext for content-based discrimination. Plaintiffs' argument ignores the distinction between a facial challenge and an as applied challenge. "In analyzing a facial challenge under the First Amendment, [this Court] considers only the text of the statute, not the application of the statute to a particular set of facts." Lusk v. Village of Cold Spring, 475 F.3d 480, 493 n.15 (2d Cir. 2007); see also Field Day v. County of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006). Favoring certain speakers over others on the basis of content "would of course be unconstitutional, but [this Court] think[s] that this abuse must be dealt with if and when a pattern of unlawful favoritism appears." Thomas, 534 U.S. at 325; see also Lusk, 475 F.3d at 496 (on a facial challenge, the court "le[ft] for another day the determination of whether, in a particular case, the ordinance's approval authority has been used improperly on the basis of the message rather than the medium").

C. As-Applied Challenge to § 2-08(c)(1)-(5)

It is "too obvious to state that a constitutional law must be enforced in a constitutional manner." Field Day, 463 F.3d at 193. Even though § 2-08(c)(1)-(5) is constitutional on its face, it may still be applied in violation of the First Amendment. Chicago Park Dist., 534 U.S. at 325; Field Day, 463 F.3d at 192-93; LaTrieste Rest. & Cabaret Inc. v. Village of Port Chester, 40 F.3d 587, 590-91 (2d Cir. 1994). The framework governing as applied challenges to time, place and manner restrictions on speech is the same as that for facial

challenges. See United For Peace & Justice v. City of New York, 323 F.3d 175, 176 (2d Cir. 2003).

"[T]ypically, 'government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" Bartnicki v. Vopper, 532 U.S. 514, 526 (2001) (quoting Ward, 491 U.S. at 791). Defendants contend that the Parks Department denied the Plaintiffs' permit request because it lacked a rain contingency plan. The Great Lawn's grass is purportedly susceptible to damage from foot traffic when wet. (Declaration of Douglas Blonsky, dated Mar. 2, 2006 ("Blonsky Decl.") ¶ 15; Pl. 56.1 Resp. ¶ 23.) Defendants assert that since 1998, the Parks Department has not permitted events to take place on the Great Lawn that could not be cancelled or postponed in the event of rain, and that concerts have been cancelled because the grass was wet. (Smith Decl. ¶¶ 56-57; Blonsky Decl. ¶¶ 18, 26.) Additionally, Defendants contend that the decision to deny Plaintiffs a permit was based on Plaintiffs' purported inability to control the size of their event using an acceptable load in plan. (Smith Decl. ¶ 34-35.) These purported justifications are not viewpoint based.

Nevertheless, this Court need not accept Defendants' proposed justifications at face value. "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, a court must carefully sort through the reasons offered to see if they are genuine." Olivieri v. Ward, 801 F.2d 602, 606 (2d Cir. 1986) (quotations omitted); see also Ecko.Complex LLC v. Bloomberg, 382 F. Supp. 2d 627, 630 (S.D.N.Y. 2005) (holding that City's justification for denial of art exhibition permit was a pretext for content based discrimination); United Yellow Cab Drivers Assoc., Inc. v. Safir, No. 98 Civ. 3670 (WHP), 2002 WL 461595, at *8 (S.D.N.Y. Mar. 22, 2002) (holding that City's justification for denial of a demonstration permit was a pretext for content based discrimination); Tunick v. Safir, No. 99 Civ. 5053 (HB), 1999 WL 511852, at *7 (S.D.N.Y. July 19, 1999) ("[C]ourts must . . . be

15

cognizant of disguised attempts to refuse the fullest scope of free speech allegedly based on governmental concerns such as safety and traffic regulations . . ."). The existence of reasonable grounds for limiting access to a forum "will not save a regulation that is in reality a façade for viewpoint-based discrimination." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 811 (1985). "Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 86 (1st Cir. 2004) (citing Texas v. Johnson, 491 U.S. 397, 411-17 (1989)).

Discovery in this action has yielded evidence that was not before this Court at the preliminary injunction stage. Based on all the record evidence, there are disputed issues of material fact regarding whether the City's purported reasons for denying Plaintiffs' permit application are pretextual. Plaintiffs proffer evidence indicating that not all permitted Great Lawn events had a rain contingency. For example, the Philharmonic's website predicted "possible showers" for the Philharmonic concerts slated for July 7 and 10, 2003. The website nevertheless declared that "[d]espite the current forecast, this evening's concert will take place as scheduled." (Declaration of Carl Messineo, dated Apr. 24, 2006 ("Messineo Decl.") Ex. 12.) That same year, over an inch of rain fell on the Great Lawn the day before the Dave Matthews Band concert. (Pl. 56.1 Stmt. Resp. ¶ 35b.) Defendants contend that they conducted an inspection of the Great Lawn and concluded that there was insufficient moisture on the turf to cause damage. (Blonsky Decl. ¶ 26.) However, a contemporaneous report authored by Defendants describes the "wet conditions" in which that concert purportedly took place. (Messineo Decl. Ex. 51.) Defendants' expert, Dr. A. Martin Petrovic, also testified that the Great Lawn was "damp" on the day of the concert. (Messineo Decl. Ex. 1: Transcript of Deposition of Martin Petrovic, dated Nov. 29, 2005 ("Petrovic Dep.") at 73.) The First Amendment does not

permit the City to selectively waive the rain contingency requirement for the Philharmonic and the Dave Matthews Band, or to selectively impose that requirement on Plaintiffs. See Thomas, 534 U.S. at 325 ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional . . ."); Field Day, 463 F.3d at 194 (noting that "serious constitutional concerns" would arise if plaintiff "could prove that Suffolk County has provided [certain] assistance to other events at the Park . . . and that its refusal here was based solely on disapproval of [plaintiff] as a speaker or the content of [plaintiff's] speech").

The City asserts that the Parks Department rejected permit applications for events involving the Dalai Lama and Billy Graham because, inter alia, these events could not be cancelled in the event of rain or wet grass. (Smith Decl. ¶ 47; Blonsky Decl. ¶ 19.) Yet the rejection letter sent by the Parks Department to the Dalai Lama event organizers makes no mention of a rain contingency. (Messineo Decl. Ex. 64.) Likewise, in an internal City email indicating that the Billy Graham event was cancelled due to its size (200,000 attendees), no rain contingency is discussed. (Messineo Decl. Ex. 37.) There are disputed issues of fact regarding the reasons why these permit requests were rejected.

Plaintiffs offer evidence that their rally could have been cancelled in the event of rain, and that they expressed their willingness to cancel the event prior to August 28, 2004. (Messineo Decl. Ex. 40: Affidavit of Brian Becker ("Becker Decl.") ¶¶ 5-6.) Plaintiffs were purportedly prepared to print their rain contingency plan on event flyers and communicate notice of cancellation to potential attendees through mass emails, phone calls and the mass media. (Becker Decl. ¶ 6.) In any event, Plaintiffs indicated prior to August 28 that they were willing to use whatever measures the Opera, the Philharmonic and other permittees use to publicize an event's cancellation. (See, e.g., Messineo Decl. Ex. 16: Letter from Council to City, dated Aug. 25, 2004.)

17

Defendants contend that Plaintiffs made none of these concessions until after this litigation was commenced and only a short time before the date of Plaintiffs' proposed event. Defendants further contend that Plaintiffs proposed an alternative to outright cancellation of their event which involved moving the event from the Great Lawn to Central Park West in the event of rain. (Binder Decl. Ex. S: Transcript of Deposition of Brian Becker, dated Dec. 2, 2005, at 42.) According to Defendants, this alternative was logistically unworkable. (Declaration of John McManus, dated Feb. 28, 2006 ¶¶ 9-13.) Yet Douglas Blonsky, President of the Conservancy, has also stated that "given the nature of a political demonstration, cancellation because of wet conditions on the grass is not feasible." (See, e.g., Messineo Decl. Ex. 8: Declaration of Douglas Blonsky, dated Aug. 2004 ¶ 35.) This is a content-based assertion for which Defendants offer no support. Cf. Beaulieu v. City of Alabaster, 454 F.3d 1219, 1233 (11th Cir. 2006) ("Because political signs are subject to more regulatory burden than real estate signs, the sign ordinance discriminates against political speech in favor of commercial speech" and "is a content-based regulation."); Sugarman, 192 F. Supp. 2d at 297 (striking down restriction on posting of signs that "impose[d] additional regulations on a distinct category of signs entitled 'political or campaign signs'").[3]

The City also argues that the Council's permit request was denied because the event was not ticketed and, absent an adequate load in plan, the size of the crowd could not be controlled. At the 2004 preliminary injunction hearing, Defendants represented to this Court that

---

[3] Defendants also assert that if the rally attendees arrived despite the wet conditions, trying to divert the thousands of people from the Great Lawn would have been "virtually impossible." (Blonsky Decl. ¶ 45.) This argument assumes that Plaintiffs could not communicate the event's cancellation to the attendees which, as discussed above, is a disputed issue of fact. Defendants also fail to adequately distinguish political rallies from the events that have been approved by the Parks Department, whose attendees would also need to be kept off the Great Lawn in the event of rain.

"the events that have taken place on the Great Lawn since the renovation have been ticketed and there has been some ability to control the number of people coming in." (Messineo Decl. Ex. 4: Transcript of Proceedings, dated Aug. 20, 2004 ("Tr.") at 63.) This contention is now contradicted by the record evidence. The City's witnesses have testified that since the Great Lawn was renovated in 1997, most events—including all Opera and Philharmonic performances—have not been ticketed. (Messineo Decl. Ex. 10: Transcript of Deposition of Adrian Benepe, dated Aug. 19, 2005 ("Benepe Dep.") at 42, 216; Ex. 3: Transcript of Deposition of Elizabeth W. Smith, dated Oct. 20, 2005 ("Smith Dep.") at 122.) To the contrary, the City has indicated in correspondence with prospective permittees that large, paid admission events on the Great Lawn are dangerous, because "it is not possible to adequately regulate any crowds who [sic] may gather around the perimeter of the lawn for such a show, creating a safety hazard." (Messineo Decl. Ex. 35.) The City has failed to explain precisely what load-in plans are permissible and why Plaintiffs' plan was deficient.

More generally, there is evidence tending to show that rallies are categorically disfavored by Defendants. For example, on or about March 23, 2004, the City held a meeting that was attended by Mayor Bloomberg and Parks Department Commissioner Adrian Benepe. Later that day, Benepe approved a draft of a "Daily Report" which stated, "We are gratified that he [Bloomberg] supported the idea of not having rallies on lawns in Central Park."[4] (Messineo Decl. Ex. 7.) Plaintiffs also proffer a 2003 email from Francesca Bertolini, a "Special Events Coordinator" for the Parks Department, to a permit applicant. Bertolini wrote: "The only events that we permit on the Great Lawn are ballgames and several large annual events such as the

---

[4] Defendants concede that the reference to "rallies on lawns" in this document is shorthand for large demonstrations on the Great Lawn. (Defendants' Response to Plaintiffs' Statement Pursuant to Local Rule 56.1, dated May 15, 2006 ¶ 10 n.4.)

Philharmonic in the Park and the Metropolitan Opera performance." (Messineo Decl. Ex. 6.) There is evidence that permits were granted to preferred speakers based in part on the speakers' financial contributions. (Messineo Decl. Ex. 21, Transcript of Deposition of Patricia Harris, dated Sept. 22, 2005, at 150.) See Hous. Works, Inc. v. Safir, 101 F. Supp. 2d 163, 170 (S.D.N.Y. 2000) ("I am troubled by the fact that if a private organization has political connections to City officials . . . the City has the authority to hold a very large event [at City Hall] honoring that organization, whereas an unpopular group . . . may be limited to assembling 50 people . . ."). To demonstrate their evenhandedness in granting permits, Defendants note that overall, the Parks Department approved 19 of 21 applications for protest events to be held in the City's parks during the period from August 23 to September 6, 2004. (Smith Decl. ¶ 22.) Whether the Parks Department has been equally unbiased with respect to permit applications for the Great Lawn is a factual issue that cannot be resolved at summary judgment.

To summarize, there are disputed issues of fact regarding whether the City's purported justifications for denying Plaintiffs' permit application were a pretext for content based discrimination. See Olivieri, 801 F.2d at 606 (recognizing that issues of fact regarding whether purported justifications are pretextual may warrant a trial on the merits); Seattle Affiliate of the Oct. 22nd Coal. v. City of Seattle, 430 F. Supp. 2d 1185, 1192-94 (W.D. Wash. 2006) (denying summary judgment on First Amendment claim arising from denial of permit request when "a reasonable juror could find that defendants' avowed concern for vehicular and pedestrian traffic safety was merely a pretext for content-based regulation"). Defendants have maintained throughout this litigation that Plaintiffs were treated the same as all other permit applicants seeking to hold events on the Great Lawn. Cf. Hous. Works, Inc., 283 F.3d at 480. Yet there is evidence contradicting this contention and supporting Plaintiffs' claim that the City favored applicants such as the Opera and Philharmonic.

20

Nor have Defendants established that the decision to deny Plaintiffs' permit application was permissible even if it was content based. To survive judicial review, a content based restriction on public forum speech must satisfy strict scrutiny. See, e.g., Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761 (1995); Boos, 485 U.S. at 321; Mahoney v. Babbitt, 105 F.3d 1452, 1457 (D.C. Cir. 1997). Such a restriction may be upheld if it serves a compelling governmental interest, is necessary to serve the asserted interest, is precisely tailored to serve that interest, and is the least restrictive means readily available for that purpose. Hobbs, 397 F.3d at 149. Defendants ignore the possibility that their permitting decision was influenced by Plaintiffs' viewpoint or the anticipated nature of Plaintiffs' speech, instead arguing that they need not have chosen the least restrictive means of achieving the relevant government interests. Thus, a trial is necessary to determine whether the decision to deny Plaintiffs' permit request violated their rights under the First Amendment.

### D. Facial Challenge to §§ 2-08(c)(6), (t)

In briefing the present motions, the parties failed to address the potential interplay between denial of summary judgment on Plaintiffs' as applied challenge to § 2-08(c)(1)-(5) and the outcome of Plaintiffs' facial challenge to §§ 2-08(c)(6) and (t). Nevertheless, this Court cannot rule on the latter claim until the former has been resolved, because the issues involved in both claims are closely related. For example, Defendants contend that § 2-08(t)(6), which requires that the Parks Department approve the load in plan for all large special events on the Great Lawn, merely codifies the Parks Department's previous management policy. (Smith Decl. ¶ 8.) As discussed in the previous section, there is evidence to suggest that § 2-08(t)(6) does not reflect the past practices of the Parks Department. If Defendants fabricated this purported requirement as a pretext to discriminate against Plaintiffs, and if the City has permitted past special events to proceed despite the absence of a load in plan or an adequate substitute, that

would undermine Defendants' contention that § 2-08(t)(6) (and possibly § 2-08(t)(3)) is narrowly tailored to serve the City's legitimate interests. Cf. Strauber v. City of New York, No. 03 Civ. 9162 (RWS), 2004 WL 1593870, at *27 (S.D.N.Y. July 19, 2004) ("[T]he Second Circuit and other courts have found narrow tailoring violations where less restrictive means of speech regulation have already been found successful."); Hous. Works, Inc. v. Safir, No. 98 Civ. 4994 (HB), 1998 WL 409701, at *3 (S.D.N.Y. July 21, 1998) ("[C]ourts in this Circuit have consistently held that numerical limits on First Amendment activity are not narrowly tailored when it has been shown that the government has sanctioned activity beyond the numerical limits prescribed in the policy."); United Yellow Cab Drivers Ass'n, Inc. v. Safir, No. 98 Civ. 3670 (RPP), 1998 WL 274295, at *3 (S.D.N.Y. May 27, 1998) (restriction on size of proposed procession of taxi cabs held unconstitutional when plaintiffs "conducted at least four processions of larger numbers of taxicabs in the past without opposition of the police department or City Hall"). On the other hand, § 2-08(t) will be more likely to satisfy the narrow tailoring requirement if the Parks Department has consistently applied the load in requirement.

Because factual disputes regarding the as applied challenge bear on Plaintiffs' facial challenge to § 2-08(c)(6) and (t), the parties respective motions for summary judgment on the latter claim are denied. The Court will address the facial challenge once the factual record in this action has been expanded and clarified. See Local 32B-32J, Serv. Employees Int'l Union v. Port Auth. of New York and New Jersey, 3 F. Supp. 2d 413, 417 n.2 (S.D.N.Y. 1998) (after jury trial on plaintiffs' challenge to restriction on speech, the court used evidence from the trial to resolve facial challenge to revised regulations).

22

III. Equal Protection Claim

The Equal Protection Clause requires that the government treat all similarly situated people alike. Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). While the Equal Protection Clause is most commonly used to bring claims alleging discrimination based on membership in a protected class, where the plaintiff does not allege membership in such a class, he can still prevail using either of two related equal protection arguments. Cobb v. Pozzi, 363 F.3d 89, 109 (2d Cir. 2003). First, a plaintiff may assert that he was subjected to "selective prosecution" under the challenged law. LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980); see also Cobb, 363 F.3d at 109. Second, a plaintiff may "assert a 'class of one' equal protection claim based on the Supreme Court's . . . decision in Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)." Cobb, 363 F.3d at 109-10; see also DeMuria v. Hawkes, 328 F.3d 704, 706-07 (2d Cir. 2003).

Defendants contend, without objection from Plaintiffs, that only the latter equal protection violation is alleged in the Amended Complaint. A "class of one" may bring an equal protection claim "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Olech, 528 U.S. at 564; see also Cobb, 363 F.3d at 110. "Thus, the three elements of a 'class of one' equal-protection claim are that 1) the person received different treatment than others similarly situated, and that this disparate treatment was 2) irrational and wholly arbitrary and 3) intentional." Morel v. Thomas, No. 02 Civ. 9622 (HB), 2003 WL 21488017, at *5 (S.D.N.Y. June 26, 2003) (citing Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir.2001)). "[T]he level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005).

Defendants move for summary judgment based solely on Plaintiffs' purported

23

failure to establish differential treatment. Specifically, Defendants contend that the Council "was treated exactly the same as other groups that sought to have events on the Great Lawn with an uncontrolled size and the inability to cancel or postpone the event if there were wet grass conditions." (Defendants' Memorandum in Support of Their Motion for Summary Judgment, dated Mar. 7, 2006, at 20.) For the reasons discussed above, there are disputed issues of fact regarding whether the Plaintiffs' proposed event truly had an uncontainable size and lacked an adequate rain contingency plan. Nor is it clear precisely what measures were taken by other permittees, if any, to control turnout or publicize a rain contingency. Therefore, a trial is necessary to determine, inter alia, whether Plaintiffs were similarly situated to other permit applicants and whether those applicants were treated differently than Plaintiffs.

24

CONCLUSION

Defendants' motion is granted in part and denied in part. In particular, Defendants' motion for summary judgment dismissing Plaintiffs' First Amendment facial challenge to § 2-08(c)(1)-(5) and § 2-08(b)(4) is granted. Defendants' motion for summary judgment dismissing Plaintiffs' as-applied challenge under the First Amendment and the Fourteenth Amendment is denied. Defendants' motion for summary judgment dismissing the facial challenge to §§ 2-08(c)(6) and (t) is denied. Plaintiffs' motion for partial summary judgment is denied in all respects.

Dated: March 6, 2007
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*

Carl L. Messineo, Esq.
Partnership for Civil Justice
1901 Pennsylvania Avenue N.W., Suite 607
Washington, DC 20006
*Counsel for Plaintiffs*

Robin Binder, Esq.
NYC Law Department
Office of the Corporation Counsel
100 Church Street
New York, NY 10007
*Counsel for Defendants*